# In the United States Court of Federal Claims

No. 11-723C
Filed:  November 24, 2014

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| GORDON JAMES KLINGENSCHMITT, | \* Tucker Act; 28 U.S.C. § 1491; Military \* Pay Act; 37 U.S.C. § 204; Military |
| Plaintiff, | \* Whistleblower Protection Act; 10 U.S.C. \* § 1034; First Amendment; Motion to \* Dismiss; Subject Matter Jurisdiction; |
| v. | \* RCFC 12(b)(1); Failure to State a \* Claim; RCFC 12(b)6); RCFC 52.1; |
| THE UNITED STATES OF AMERICA, | \* Board of Corrections of Naval Records; \* Special Courts-Martial Conviction; |
| Defendant. | \* Navy Chaplain; Religious \* Discrimination; Waiver of Claims. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*John Bennett Wells*, Law Office of John B. Wells, Slidell, LA, for plaintiff.

*Mikki Cottet*, Civil Division, Commercial Litigation Branch, United States Department of Justice, Washington D.C., for defendant.  With her on the briefs were *Stuart Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Brian M. Simkin*, Assistant Director, *Bryant Snee*, Deputy Director, *Lt. Ian Santicola*, JAGC, USN and *Lt. Commander Andrew Carmichael*, JAGC, USN, General Litigation Division, Office of the Judge Advocate General, Department of the Navy, Of Counsel.

## OPINION AND ORDER

**Kaplan, Judge.**

The plaintiff in this action is Gordon James Klingenschmitt (hereinafter "Dr. Klingenschmitt" or "plaintiff"), a former Navy chaplain.  Dr. Klingenschmitt contends that the Navy acted unlawfully and in violation of his constitutional rights when it discharged him from the Navy after declining to recertify him as a chaplain in the wake of his loss of his existing ecclesiastical endorsement.  He argues that his separation was unlawful and requests that the Court award him back pay, reinstatement, correction of his military records, and attorney's fees.

Incident to his wrongful discharge claim, Dr. Klingenschmitt challenges the decisions of the Board of Correction of Naval Records ("BCNR" or "Board") denying his request to remove two fitness reports from his naval records which he contends were the product of discrimination and retaliation by his superior officers.  He also mounts a collateral attack on his court-martial conviction, which served as one of the bases for the Navy's decision not to recertify him as a chaplain.  In addition, his complaint raises a variety of claims under other constitutional or statutory provisions:  the First Amendment; the Religious Freedom Restoration Act ("RFRA"),

42 U.S.C. § 2000bb; the Military Whistleblower Protection Act ("MWPA"), 10 U.S.C. § 1034; and 10 U.S.C. § 6031(a) (providing that "[a]n officer in the Chaplain Corps may conduct public worship according to the manner and forms of the church of which he is a member").

Before the Court is the government's motion to dismiss pursuant to the Rules of the Court of the Federal Claims ("RCFC") 12(b)(1) and 12(b)(6), and in the alternative, for judgment upon the administrative record and plaintiff's cross motion for judgment on the administrative record. For the reasons stated below, the government's motion to dismiss for failure to state a claim is **DENIED**. The government's motion to dismiss for lack of subject matter jurisdiction is **DENIED-IN-PART** and **GRANTED-IN-PART**. The government's motion for judgment on the administrative record is **GRANTED**. Plaintiff's motion for judgment on the administrative record is **DENIED**.

## BACKGROUND

### I. Service as Chaplain on the USS Anzio

Dr. Klingenschmitt was a Cadet in the United States Air Force Academy from July 1, 1986 to May 28, 1991. Administrative Record ("AR") 1933.[1] He entered into active duty in the United States Air Force on May 29, 1991 and continued his service with the Air Force until September 2, 2002. Id.

On September 3, 2002, Dr. Klingenschmitt transferred from the Air Force to the Navy and began his career as a Navy chaplain, with an ecclesiastical endorsement[2] from the Evangelical Episcopal Church. See AR 1933, 1945. After completing chaplain school in late November 2002, AR 912, Klingenschmitt was assigned as Command Chaplain to the guided missile cruiser USS Anzio (CG-68), where he served under the command of Captain James M. Carr. AR 1874-75.

Dr. Klingenschmitt's complaint alleges that beginning with his time in chaplain school he felt pressured by his superiors "to censor the content of his public prayers if offered outside of Sunday chapel." Compl. ¶ IX. In Dr. Klingenschmitt's complaint and his briefs, he focuses in particular upon his superiors' reaction to a sermon he delivered at a June 26, 2004 memorial

---

[1] The administrative record in this case consists of two filings by the government: the administrative record filed on April 11, 2012 and a supplemental administrative record filed on November 19, 2014. The Court will use "AR" before a citation to the administrative record filed on April 11, 2012 and "SAR" before a citation to the supplemental administrative record.

[2] Department of Defense Instruction 1304.28 requires an individual applying to serve as a chaplain to submit an ecclesiastical endorsement from a Department of Defense listed religious organization as part of the certification process. Dep't of Def., Instr. 1304.28, Guidance for the Appointment of Chaplains for the Military Departments para. 6.1.1.1 (11 June 2004) [hereinafter DoDI 1304.28].

service for a recently deceased Anzio crew member.  Compl. ¶ XII.[3]  According to Dr. Klingenschmitt, he based the content of the sermon on a previous sermon to which the deceased shipman had responded favorably at a Sunday service over which Dr. Klingenschmitt presided. AR 2322, 2360.  In the sermon, which contains extensive references to Romans 8 and other New Testament sources, Dr. Klingenschmitt offered his observations regarding, among other things, man's sinful nature, the redemption of sins through acceptance of Jesus as one's savior, and the certainty of being "cast into hell" if one did not.  AR 2322-27.

Following the memorial service, Captain Carr, the commanding officer of the Anzio, received "no fewer than two dozen specific verbal and written complaints from Sailors and family members who attended the service."  AR 2138.  In the days following the memorial service, Captain Carr and Dr. Klingenschmitt apparently discussed the sermon and the concerns that had been raised by attendees of the event.  AR 2139; see also 2358-59 (email exchange describing discussions).  In an email, Dr. Klingenschmitt attributed the issues identified by Captain Carr to Dr. Klingenschmitt's "failure to understand the nature of [Captain Carr's] request for a memorial service."  AR 2358.  Specifically, Dr. Klingenschmitt observed that "I think what happened between us is that I heard you asking for a memorial service when [what] you may have wanted was a memorial ceremony."  AR 2359.[4]

In an email responding to Dr. Klingenschmitt, the Captain stated that he did not think that the "disconnect in communication was as simple as a choice of word . . . service vs. ceremony." AR 2358.  "Our disconnect," he stated, "is far more profound than you appear to have registered after our conversation."  AR 2358.  Thus, he continued, "[a]s I have told you many, many times . . . and you have acknowledged many, many times.  I will not presume to advise you how to provide pastorship to 'your flock.'"  AR 2358.  He further stated that "I will insist that you refrain from intrusive counseling and pastorship, keeping your message to those who will receive it willingly."  AR 2358.  The Captain stated that "I have far too many complaints from Sailors who do not appreciate the strident and negative message they perceive you to be delivering." AR 2358.

The email also alluded to previous communication between Dr. Klingenschmitt and Captain Carr.  According to Captain Carr:  "I have asked you to assist me in 'inspiring Sailors to reach for their better selves' no matter what faith or belief system they practice.  I have asked you to deliver a more ecumenical message.  You finally told me yesterday that there is a limit to

---

[3] This memorial service, which was held in the David Adams Memorial Chapel at Naval Station Norfolk, was a command-sponsored event.  AR 2138, 2350.  The program for the event lists Dr. Klingenschmitt as one of the participants, along with Captain Carr, the commanding officer, and Command Master Chief Roger McCormack.  AR 2350.

[4] According to Dr. Klingenschmitt, in chaplain school, he had been taught that a memorial "ceremony" was a secular event held in a public place in which the Commanding Officer, rather than the chaplain, presides, and for which attendance might be mandated.  AR 2358-29.  A memorial "service," by contrast, was a religious event usually held in a chapel in which the chaplain presides.  Id. at 2359.

3

the 'compromises you can make' in your message to make it more ecumenical." AR 2358. Captain Carr concluded the email by suggesting he may "need to educate [himself] as to what compromises are reasonable for [him] to ask and expect [of Dr. Klingenschmitt] in order for [his] Sailors to receive the inspiring pastorship [he] would hope for them to receive." AR 2358.

On July 7, 2004, Captain Carr issued a "letter of instruction" to Dr. Klingenschmitt. AR 2340. The letter of instruction "called Lieutenant Klingenschmitt's attention to a number of professional performance deficiencies both in his conduct as an officer and in his accomplishment of the command religious ministries program mission." AR 2340.[5]

Also in July 2004, Captain Carr conducted a command survey of the religious ministries program. AR 2118. Of the 215 crew members who completed the survey, eighty provided written comments. AR 2119. The majority of the comments (about 70%) were negative in nature. AR 2119. For example, comments included: "worst CHAP I have seen in 17 years," "would never seek counsel from CHAPS," and "he is one of the worst CHAPs I have seen." AR 2119.[6]

In light of the results of the first survey, a second survey was conducted in November 2004. AR 2118. The record does not include the results of the second survey. See AR 2121.

## II. The 2005 Fitness Report

On January 31, 2005, Captain Carr issued Dr. Klingenschmitt a fitness report[7] covering the period of February 1, 2004 to January 31, 2005. AR 1880-81. Dr. Klingenschmitt received

---

[5] The letter of instruction is not in the record. It is referenced in a report prepared in connection with an investigation of a grievance (Article 138 Complaint of Wrongs) that Klingenschmitt filed against Captain Carr. AR 2340. According to the report, the letter identified instances in which Dr. Klingenschmitt: (1) circumvented the chain of command in advocating for kosher meals for a crew member; (2) unilaterally took action that was viewed as withdrawing the Anzio from participation in an event during "Fleet Week"; and (3) failed to "provid[e] a command religious ministries program that appropriately cared for and met the needs of the entire ANZIO crew." AR 2340

[6] The Court relies upon the characterization of the survey results contained in an investigative report that was prepared in connection with the Article 138 Complaint of Wrongs against Captain Carr. Neither the survey questions nor answers are included in the administrative record.

[7] The Navy requires all officers to receive a "fitness report" at least once a year. U.S. Dep't of Navy, Bureau of Naval Personnel Instr. 1610.10, Navy Performance Evaluation and Counseling System Enclosure (1) at 3, 6 (02 August 1995) (canceled 20 September 2005)[hereinafter BUPERSINST 1610.10]. That report includes numerical grades on performance in various areas and comments from reporting seniors. Enclosure (1) at 3. Selection for promotion is, in part, based on the grades and comments on these official records.

ratings of 4.0 ("Above Standards") for four of the performance traits (Professional Expertise; Command or Organizational Climate/Equal Opportunity; Military Bearing/Character; and Leadership). AR 1880-81. He received the highest rating 5.0 ("Greatly Exceeds Standards") for the other two performance traits (Teamwork and Mission Accomplishment/Initiative). AR 1880-81.

The report included a number of positive comments about Dr. Klingenschmitt's performance. Among other things, it noted that Dr. Klingenschmitt had demonstrated a "professional and positive response to a command climate survey" and that he was "making progress in improving the appeal of this important program to a broader audience in ANZIO's crew." AR 1881.[8]

The fitness report form also contains a "Promotion Recommendation" section. According to the Navy's regulations, there is a five-step promotion recommendation scale: "Significant Problems," "Progressing," "Promotable," "Must Promote," and "Early Promote." BUPERSINST 1610.10, Enclosure (2) at A12.[9] Captain Carr checked "Must Promote." AR 1881. This was a decline from the "Early Promote" recommendation that Captain Carr had made in Dr. Klingenschmitt's January 2004 report, covering the period from August 23, 2003 to January 31, 2004. AR 1876-77.

Dr. Klingenschmitt signed the evaluation acknowledging that he received the report and that he understood his right to make a statement in response to the evaluation. AR 1881. In the signature block, he indicated that he did not intend to submit a statement. AR 1881.

### III. Article 138 Complaint of Wrongs Against Captain Carr

In May 2005, Dr. Klingenschmitt submitted an Article 138 Complaint of Wrongs against Captain Carr. AR 1429-33. Among other things, Dr. Klingenschmitt alleged that Captain Carr had discriminated against him on the basis of his personal religious beliefs and the practices of his religious denomination; that the decline in the promotion recommendation in his January 31, 2005 fitness report (from "Early Promote" to "Must Promote") was "for religious reasons" and based on false written statements; and that Captain Carr had censored Christian prayers and "grant[ed] full government endorsement (and enforced religious conformity) to the non-Christian Unitarian Universalist faith of 'Pluralism.'" AR 1430.

---

[8] In particular, the report noted, Dr. Klingenschmitt had "specifically opened his Protestant Bible Study to sponsor group discussions with members of the Jewish, Muslim, Catholic, and Orthodox faiths, enhancing understanding and fostering an inclusive atmosphere." AR 1881.

[9] The Navy instructions provide that "'Early Promote' recommendations are based solely on performance, and do not require eligibility for early promotion." BUPERSINST 1610.10, Enclosure (1) at 1. The instructions limit the number of "Early Promote" recommendations. BUPERSINST 1610.10, Enclosure (2) at A-12 to A-13. Personnel filling out the form are instructed not to "automatically place individuals in the 'Early Promote' category when they are evaluated singly." BUPERSINST 1610.10, Enclosure (1) at 4.

The Commander of Navy Region Mid-Atlantic investigated Dr. Klingenschmitt's complaint and, in an extensive and detailed report of findings, concluded that there was no merit to his allegations.  AR 2129-46.  He found that the declining fitness report was not a product of discrimination but was based on "Captain Carr's legitimate evaluation of [Dr. Klingenschmitt's] performance of duty," observing that "Lieutenant Klingenschmitt's level of effort to meet command expectations was a proper matter for Captain Carr to consider in evaluating Lieutenant Klingenschmitt's performance in his periodic fitness report."  AR 2137, 2139.  He also found that Dr. Klingenschmitt's allegations regarding the censorship of his prayers were without merit, because "no one, including Captain Carr, has told Lieutenant Klingenschmitt that he may not preach any Gospel message, or that he may only preach certain messages."  AR 2139.  The Commander further reasoned that the concerns Captain Carr expressed about the tone of the sermon that Dr. Klingenschmitt had delivered were supported by the feedback he had received, which indicated that the sermon "did not support the purpose of the memorial service, which was intended to pay respects to a deceased crewmember and console the crew."  AR 2139.  In particular, the report noted that "the impact Lieutenant Klingenschmitt's performance at the command memorial service had on command morale was a legitimate matter of concern to the Commanding Officer, and was a proper matter to consider in evaluating the officer's performance."  AR 2139.

The investigative report was forwarded to the Deputy Assistant Secretary of the Navy for Military Personnel Policy.  AR 2111.  She concurred in the findings of Region Mid-Atlantic. AR 2111-28.

### IV. Orders Issued to Dr. Klingenschmitt Regarding the Wearing of His Uniform at Media Events

In April 2005, Dr. Klingenschmitt was transferred to Naval Station Norfolk.  See AR 1878-1879, 2121.  On December 15, 2005, Captain Lloyd Pyle, Jr., the Commanding Officer of Naval Station Norfolk, became aware of Dr. Klingenschmitt's plans to appear on the Bill O'Reilly television show on the Fox News station on December 19, 2005.  AR 519-21; see also AR 1454 (December 15, 2005 Letter from Dr. Klingenschmitt to President Bush advising that "Monday night I'm scheduled to appear on Bill O'Reilly's TV show, and I plan to appear in uniform, unless you personally order me to wear civilian attire").  The next day, on December 16, 2005, Captain Pyle issued an order to Dr. Klingenschmitt entitled "WEARING OF NAVAL UNIFORM AT PUBLIC VENUES."  AR 880, 1458.  Captain Pyle instructed that, pursuant to paragraph 1401.3(b) of the Navy Uniform Regulations,[10] Dr. Klingenschmitt was prohibited

---

[10] Paragraph 1401.3(b) states in pertinent part:

> (1) Members of the Armed Forces (including retired members and members of reserve components).  Wearing of uniforms is prohibited under any of the following circumstances:
>     (b) During or in connection with political activities, private employment or commercial interest, that imply official sponsorship of the activity or interest.

from wearing his uniform for this appearance or for any other media appearance without Captain Pyle's "express prior permission." AR 880, 1458. Captain Pyle also explicitly advised Dr. Klingenschmitt that the violation of the order could result in disciplinary action under the Uniform Code of Military Justice ("UCMJ"). AR 880, 1458.

It is unclear from the record whether Dr. Klingenschmitt's planned appearance on the Bill O'Reilly show ever took place. See AR 100 (Captain Pyle's testimony that he understood that the appearance had been canceled). Nonetheless, on January 3, 2006, Dr. Klingenschmitt sought clarification from Captain Pyle regarding the scope of the December 16th order, particularly as it applied to his participation in an upcoming event organized by a "clergy lobbyist group." AR 881-83; 954; see also AR 104 (Captain Pyle's testimony referring to the event as one "done by some Political Action Committee"). In his request for clarification, Dr. Klingenschmitt noted that the Navy's uniform regulations permitted him to wear his uniform "when attending or participating in a bona fide religious service or observance." AR 954. He inquired as to whether the order prohibited him "from publicly worshipping Jesus Christ, or saying public prayers 'in Jesus name' while in uniform." AR 954. His letter also cited 10 U.S.C. § 6031, which provides that "[a]n officer in the chaplain corps may conduct public worship according to the manner and

_____

(c) When participating in activities such as public speeches, interviews, picket lines, marches, rallies or any public demonstration which implies the service supports the principles of the demonstration or activity. This rule may be waived by the service.

(4) For Members of the Naval Service. The Secretary [of] the Navy supports the following:

(a) Exercising the rights of freedom of speech and assembly does not include the right to use the inherent prestige and traditions represented by the uniforms of the naval service to promote privately held convictions on public issues.

(b) Members of the Navy and Marine Corps, including retired members and members of reserve components are prohibited from wearing uniforms of the naval service while attending or participating in a demonstration, assembly, or activity knowing that a purpose of the demonstration, assembly, or activity supports personal or partisan views on political, social, economic, or religious issues, except as authorized in advance by competent authority; or incident to attending or participating in a bona fide religious service or observance.

(5) Other Than Official Events. A commanding officer may authorize wearing the uniform when assured that the service member is not appearing in uniform at the particular event, to promote privately held convictions or interests, or lead the observers to believe that the demonstration, assembly, or activity does not relate to matters in public controversy.

U.S. Dep't of Navy, Reg. 15666I, U.S. Navy Uniform Regulations para. 1401.3(b) (19 April 1991) [hereinafter NAVPERS 15665I].

forms of the church of which he is a member." AR 954. He inquired whether Captain Pyle's December 16th order "intend[s] to abrogate [the] US code, which protects my right to worship publicly in uniform." AR 954. Dr. Klingenschmitt's letter closes with a request for Captain Pyle's "express permission to participate in bona fide public worship events wearing my uniform." AR 954.

Three days later, on behalf of Captain Pyle, the Commanding Officer of Naval Station Norfolk responded to Klingenschmitt's request for clarification. AR 881-83. The Commanding Officer stated that the order directed that he not wear his uniform for an appearance on the Bill O'Reilly show because "[i]t was clear the purpose of [Dr. Klingenschmitt's appearance] was to support personal or partisan views on political, social, and religious issues." AR 881. He explained that "[t]he order did not direct that you 'may not wear (your) uniform in public if (you) talk about religion or if TV cameras may be present." AR 881. Instead, the Commanding Officer explained that the phrase "media appearances" as used in Captain Pyle's Order "meant interviews, press conferences, press availabilities, and similar events, like the scheduled interview on the Bill O'Reilly show, where you deliberately engage with the press to express personal views." AR 881. The Commanding Officer clarified that the uniform regulations "permit[] a member of the naval service to wear his or her uniform, without obtaining authorization in advance, incident to attending or participating in a bona fide religious service or observance." AR 882.

The Commanding Officer also responded to Dr. Klingenschmitt's request for permission to participate in uniform during the upcoming weekend at an event that Dr. Klingenschmitt had characterized as "bona fide public worship." See AR 882. He noted that he understood Dr. Klingenschmitt to be requesting permission to participate in the event in his personal capacity and not in his official capacity or as part of his official duties. AR 882. He stated that based on the limited information Dr. Klingenschmitt had provided and the fact "that the event was being organized by a clergy lobbyist group, I have strong reservations about whether this event will, indeed, be a bona fide religious service or observance, rather than a demonstration or assembly to promote personal or partisan views on political, social, or religious issues." AR 882. Therefore, the Commanding Officer recommended that Dr. Klingenschmitt not wear his uniform to the event. AR 882. He further observed that notwithstanding his recommendation, Dr. Klingenschmitt must use his "own best judgment to evaluate the facts and conform [his] conduct to regulations." AR 882. He concluded finally with the following warning:

> If, despite my recommendation, you choose to participate in this event in uniform, you should limit your participation, while in uniform, to the "bona fide religious service or observance." If the event becomes a demonstration or assembly of personal or partisan views you are directed to ensure that you conform to the guidance as specified in [U.S. Navy Uniform Regulations]. You should not, while in uniform, give interviews, make speeches, or otherwise engage in public advocacy of personal or partisan views on political, social or religious issues.

AR 882.

### V. The January 7, 2006  Event

On January 7, 2006, Dr. Klingenschmitt participated in the event in Lafayette Park that he had described as a religious observance.  AR 106.  After saying a prayer at the event, Dr. Klingenschmitt walked away from the immediate area and, while still in the view of event participants and the media, removed identifiable portions of his Navy uniform.  AR 106.  He replaced them with a clerical collar before making statements to the press.  AR 106.

### VI. The 2006 Fitness Report

Nearly one month after the event in Lafayette Park, on February 3, 2006, Dr. Klingenschmitt received his fitness report[11] from Captain Pyle for the period of July 23, 2005 to January 31, 2006.  AR 1868-69.  Dr. Klingenschmitt's ratings on the listed performance traits were markedly lower than they had been in the 2005 fitness report.  He did not receive any ratings of 5.0 ("Greatly Exceeds Standards").  See AR 1868-69.  He received ratings of 4.0 ("Above Standards") on Professional Expertise and on Mission Accomplishment/Initiative.  AR 1868-69.  He received a rating of 2.0 ("Progressing") for Military Bearing/Character.  AR 1869.  The other performance traits (Command or Organizational Climate/Equal Opportunity; Teamwork; and Leadership) were all rated at 3.0 ("Meets Standards").  AR 1868-69.

The narrative in the fitness report contained negative comments concerning the lack of military bearing and professionalism allegedly exhibited by Dr. Klingenschmitt in connection with at least some of his advocacy activities.  It noted that "while he exhibits enthusiasm and expends maximum effort in support of personal goals and convictions, he fails to meet standards in military bearing."  AR 1869.  With respect to the latter, Captain Pyle specifically noted the following:

- Respect for the uniform. Intentionally removed his uniform in a public setting and in the presence of media.
- Openly challenged the authority of his chain of command.  Examples include:  a statement that he answers only to the President and repeated use of intemperate language in the media, in reference to senior leadership.

AR 1869.  Finally, Captain Pyle observed, Dr. Klingenschmitt "needs to improve his military bearing and professionalism in order to become a more effective Naval Officer."  AR 1869; see also AR 107-08.

Based on this evaluation, Captain Pyle's promotion recommendation designated Dr. Klingenschmitt "Promotable," a decline in rating from the prior fitness report.  AR 1869; see also AR 1881.  Dr. Klingenschmitt acknowledged receipt of the report and indicated that he

---

[11] U.S. Dep't of Navy, Bureau of Naval Personnel Instr. 1610.10, Navy Performance Evaluation and Counseling System Enclosure (20 Sept. 2005) (canceled 09 July 2008) [hereinafter BUPERSINST 1610.10A].

wished to submit a personal statement to accompany the report.  AR 1869.  There is no indication in the record, however, that he ever submitted such a statement.

### VII. February 28, 2006 Letter of Caution Regarding Statements on Dr. Klingenschmitt's Website

On February 28, 2006, the Commanding Officer of Naval Station Norfolk issued Dr. Klingenschmitt a nonpunitive letter of caution.  AR 1495-97.  The letter stated that public statements on Dr. Klingenschmitt's website violated Article 89 of the UCMJ, "disrespect toward a senior commissioned officer."  AR 1495.  The letter referenced remarks Dr. Klingenschmitt made concerning the Chief of Navy Chaplains' official statements on public prayer in the Navy.  AR 1495.  See AR 2229-32 (Dr. Klingenschmitt's rebuttal to the Chief of Chaplain's Prayer Policy).  It acknowledged that Dr. Klingenschmitt could discuss his disagreement with Navy policy in such a public forum but criticized his use of "intemperate language" directed toward senior Navy leadership.  AR 1495-96.[12]  In addition, the letter stated that Dr. Klingenschmitt "failed to use the chain of command properly to route official correspondence and communications" thereby "not only completely disregard[ing] proper procedures, but also detract[ing] from the respect due the authority and persons of three superior commissioned officers."  AR 1497.  The Commanding Officer asked Dr. Klingenschmitt "to remove all disrespectful language on your publicly accessible website that refers directly and indirectly to senior commissioned officers and the President of the United States" "within five calendar days of receipt of this letter."  AR 1497.

Dr. Klingenschmitt responded to the letter stating that "after a good-faith 'review and scrub' I believe I've complied with your direction to censor and sanitize my web-site."  AR 1498.   Invoking the MWPA, Dr. Klingenschmitt warned that "[w]hile I consented this one time to modify the content of my communications to Congress, I shall not do so again."  AR 1499.  He noted that he "will respect rank, but never their abuse of power and religious harassment, of which I directly accuse them in my whistleblower reports."  Id.

---

[12] One example of such "intemperate language" cited by the Commanding Officer is as follows:  "Mr. President, will you protect our right to pray publicly in Jesus [sic] name in the daylight, without punishment by senior chaplains and commanding officers, who routinely censor and punish our prayers? Did anyone swear to defend the Constitution?" AR 1496. According to the commander, this comment was inappropriate because it "is not limited to disagreement with Navy Policy."  AR 1496.  Instead, he observed, "[t]he tone of your question clearly impugns your senior leadership's honor and is contemptuous of their Naval service."  AR 1496.   Another example cited was Dr. Klingenschmitt's statement that "today Chaplain Iasello takes a black-magic marker to the Constitution, entirely blots out the First Amendment, and assumes HIS unlawful authority holds more power than Federal Law since 1860."  AR 1496.  The Commanding Officer concluded that this statement was unacceptable because it showed "disdain and insubordination toward a specific superior commissioned officer by accusing him of personally disregarding the Constitution and considering himself above the law."  AR 1496.

## VIII. Dr. Klingenschmitt's Violation of Captain Pyle's Order

On March 30, 2006, Dr. Klingenschmitt appeared in uniform at another event in Lafayette Park.  AR 2, 612-625, 884-890.  The event was organized as a form of protest against Navy policy, which the organizers characterized as prohibiting chaplains from "saying a Christian prayer ending with the phrase 'through Jesus Christ our Lord,' while wearing a Navy uniform."  AR 899.  Dr. Klingenschmitt stood near the podium in uniform throughout the event and said at least one prayer during this event.  AR 624-25, 629, 898.  Prior and subsequent to the event and while in Navy uniform, Dr. Klingenschmitt distributed documents to members of the press and other attendees, including a document entitled "Remarks by Reverend Patrick Mahoney, speaking for Chaplain Klingenschmitt who cannot say everything he wants to while in uniform."  AR 619-22, 677-80, 898-900.  The "remarks" document characterized the event as a "press conference" and stated that Dr. Klingenschmitt was appearing in uniform so as to "intentionally" violate the orders of his superior officers.  AR 899.  The document indicated that Dr. Klingenschmitt "fully expect[ed]" to be punished for disobeying his superior's orders.  AR 900.

Shortly thereafter, Dr. Klingenschmitt's expectations were realized.  By Memorandum of April 27, 2006, Captain Pyle notified him that he was considering imposing non-judicial punishment on him for disobeying the order and the Navy's Uniform Regulations by appearing in uniform at the March 30th press conference in support of personal views on political or religious issues.  AR 1520-22.  Dr. Klingenschmitt exercised his right to refuse non-judicial punishment and demanded a trial by court-martial.  AR 2274-75.

## IX. The Whistleblower Complaint

In the meantime, after the March 30, 2006 event, on April 4, 2006, Dr. Klingenschmitt filed a complaint with the Department of Defense Inspector General ("IG") alleging that personnel actions prohibited by 10 U.S.C. § 1034(b) had been taken against him.  See AR 1512. In his complaint, Dr. Klingenschmitt stated that he had "declared myself a whistleblower in April 2005, complaining directly to Congress (and publicly via my website and public media to other Congressmen) of violations of the Constitution by senior officials, and religious harassment, which I suffered at the hands of my former Commanding Officer, CAPT James M. Carr and several senior chaplains, including the Chief of Navy Chaplains Rear Admiral Louis V. Iasiello, who conspired to punish me for the content of my prayers and sermons."  AR 1512.  The complaint outlined twenty-five alleged acts of reprisal, including, among others, the declining promotion recommendations in his 2005 and 2006 fitness reports, the reprimands for his use of allegedly intemperate language on his website and elsewhere, the instructions not to wear his uniform at media events (which he characterized as "remov[ing] my right to wear a uniform when praying in Jesus name or defending the Constitution against its domestic enemies") and the initiation of non-judicial punishment proceedings against him.  AR 1512-1519.  He claimed that these acts occurred "not because of my performance as a chaplain (which they acknowledge I do well), rather directly because of my off-duty whistleblower activities, and because I spoke out publicly against religious harassment in the Navy."  AR 1519.

On October 3, 2006, the IG's Director of Military Reprisal Investigations responded to Dr. Klingenschmitt's whistleblower complaint. AR 2236. She observed that she had conducted a preliminary inquiry in which she reviewed the documentation that Dr. Klingenschmitt had provided as well as documentation from other sources, and the testimony of knowledgeable witnesses. AR 2236. See SAR 293-305 (records of the Complaint Review Committee's review of the IG's preliminary investigation of Dr. Klingenschmitt's claims). She stated that based upon this inquiry she had decided that Dr. Klingenschmitt's allegations did not warrant investigation for a number of reasons. AR 2236. Among other things, she concluded that Dr. Klingenschmitt received an unfavorable fitness report on February 3, 2006 "based on observed shortcomings in military bearing" noting that "[w]itness testimony and documentary evidence establish that your Commanding Officer would have taken the same action absent your protected communications." AR 2236. The IG's office did not investigate Dr. Klingenschmitt's allegations that the Commanding Officer had initiated non-judicial punishment against him in reprisal for his protected communication because that matter was then under the purview of the military justice system. AR 2236. It found that the other matters Dr. Klingenschmitt complained of were either not timely raised or that the actions were not considered unfavorable personnel actions as defined by applicable Department of Defense directives governing the MWPA. AR 2237.

The IG's office accordingly closed Dr. Klingenschmitt's case, advising him of his right to seek further review before the BCNR. AR 2337.

### X. The Court-Martial Proceeding

In the meantime, on August 3, 2006, Dr. Klingenschmitt was charged with one specification of a violation of 10 U.S.C. § 892, Article 92 of the UCMJ (failure to obey order or regulation).[13] AR 49. On August 4th, the Commander of Navy Region Mid-Atlantic referred the charge against Dr. Klingenschmitt to a special court-martial. AR 1901-02. Dr. Klingenschmitt was served with the charges against him and was assigned a military defense counsel in addition to his private civilian defense counsel. AR 40-43. Dr. Klingenschmitt pled not guilty to the charge and requested trial by members. AR 377-78.

Prior to trial, Dr. Klingenschmitt filed several motions, including two motions to dismiss. The first motion to dismiss was based on Dr. Klingenschmitt's contention that Captain Pyle's order was not lawful because, among other things, it was not specific and it was not in compliance with federal law, including the First Amendment. AR 1061-97. The military judge heard testimony and oral argument but denied Dr. Klingenschmitt's motion, ruling that the order

---

[13] Article 92 states:

> Any person subject to this chapter who—
> > (1) violates or fails to obey any lawful general order or regulation;
> > (2) having knowledge of any other lawful order issued by a member of the armed forces, which it is his duty to obey, fails to obey the order; or
> > (3) is derelict in the performance of his duties;
> shall be punished as a court-martial may direct.

was specific and not in violation of established law or the First Amendment.  AR 1583-86.  The military judge also denied Dr. Klingenschmitt's second motion to dismiss, in which he argued that Rear Admiral F.R. Ruehe, Commander Navy Region Mid-Atlantic, improperly acted as the convening authority for the court-martial because he allegedly had a personal interest in the outcome of the case.  AR 1152-71, 1775-77.

On September 13, 2006, after hearing testimony, the court-martial members found Dr. Klingenschmitt guilty of violating one specification of Article 92.  AR 769-70, 1899-1900.  The members sentenced Dr. Klingenschmitt to the forfeiture of $250 in pay per month for twelve months and a reprimand.  AR 1899-1900.  The members unanimously recommended that the forfeiture of pay be suspended for twelve months.  AR 851.  Immediately following his conviction and sentence, Dr. Klingenschmitt was served two documents detailing his appellate rights.  AR 854-55.  Dr. Klingenschmitt signed the documents indicating that he understood his rights on appeal, and the military judge confirmed in court that Klingenschmitt understood his appellate rights.  AR 24-30, 854-55, 1863-64.

### XI. The Navy's Decision Not to Recertify Dr. Klingenschmitt as a Chaplain

On September 25, 2006, twelve days after his conviction, Dr. Klingenschmitt voluntarily tendered his resignation from the Evangelical Episcopal Church.  AR 1894.  On that same day, the Evangelical Episcopal Church notified the Chief of Naval Personnel that Dr. Klingenschmitt had lost his ecclesiastical endorsement, effective October 1, 2006.  AR 1885.  On September 28, 2006, the Chaplaincy of Full Gospel Churches executed an ecclesiastical endorsement for Dr. Klingenschmitt and transmitted a copy of that endorsement to the Chief of Navy Chaplains by facsimile on September 29, 2006.  AR 2001-02.

By letter dated September 29, 2006, the Chief of Naval Personnel forwarded to Dr. Klingenschmitt a copy of the Evangelical Episcopal Church's September 25th letter withdrawing its endorsement of Dr. Klingenschmitt and a copy of the Chaplaincy of Full Gospel Churches September 29th endorsement of Dr. Klingenschmitt.  AR 2000.  The Chief of Naval Personnel advised Dr. Klingenschmitt that, pursuant to the requirements of DoDI 1304.28[14] and

---

[14] DoDI 1304.28, ¶ 6.5 states:

> If a chaplain loses ecclesiastical authority to function as an RMP [Religious Ministry Professional] or has ecclesiastical endorsement to serve as a chaplain withdrawn, the appropriate Religious Organization shall provide written notification to the Military Department concerned.  Processing for separation in accordance with Section 643 of [Title 10 of the United States Code] shall be initiated immediately upon such notification.

Section 643 states that "[u]nder regulations prescribed by the Secretary of Defense, a commissioned officer on the active-duty list of the Army, Navy, or Air Force who is appointed or designated as a chaplain may, if he fails to maintain the qualifications needed to perform his professional function, be discharged or, if eligible for retirement, may be retired."

Secretary of the Navy Instruction 1730.7C[15], "the loss of your ecclesiastical endorsement from The Evangelical Episcopal Church, effective 1 October 2006, renders you professionally unqualified to serve as a Navy Chaplain." AR 2000.  Furthermore, beginning October 1, 2006, Dr. Klingenschmitt could no longer "perform any duties as a Navy Chaplain." AR 2000.  The Chief of Naval Personnel informed Dr. Klingenschmitt that his "Commanding Officer will assign you duties commensurate with your rank and abilities." AR 2000.  Dr. Klingenschmitt was also notified that his "ecclesiastical endorsement from the Chaplaincy of Full Gospel Churches does not, standing alone, make you professionally qualified to serve as a Navy Chaplain.  Should you desire [to] be considered for further service as a Navy Chaplain, your attention is directed to the requirements of [DoDI 1304.28] and [Office of the Chief of Naval Operations Instruction 1120.9[16]]." Id.

Notwithstanding the letter from the Evangelical Episcopal Church documenting the withdrawal of its endorsement of Dr. Klingenschmitt (AR 1999), by letter to the Chief of Chaplains dated September 30, 2006, Dr. Klingenschmitt stated that he never "lost" his endorsement.  AR 2004.  He argued that, because the Navy had received a new endorsement, OPNAVINST 1120.9 required that he be promptly recertified.  AR 1894, 2004.  The Navy responded by letter dated October 4, 2006, and reiterated that Dr. Klingenschmitt's new endorsement from the Chaplaincy of Full Gospel Churches did not automatically qualify him to serve as a chaplain.  AR 2007-09.  That letter also noted that Dr. Klingenschmitt had the right to request that the Secretary approve his new ecclesiastical endorsement, and informed Dr. Klingenschmitt that if he availed himself of this option, the Chief of Chaplains would make a recommendation to the Secretary, who would ultimately make the final decision concerning Dr. Klingenschmitt's new ecclesiastical endorsement.  AR 2008.  The October 4th letter also informed Dr. Klingenschmitt that, pursuant to the mandatory requirements of DoDI 1304.28, ¶ 6.5, the Navy had initiated administrative action and convened a Chaplain Appointment and Recall Eligibility Advisory Group (CARE board) to separate him from the Navy because of the loss of his ecclesiastical endorsement.  AR 2007.

On October 6, 2006, Dr. Klingenschmitt sent a letter to the Chief of Naval Personnel requesting all documents pertaining to his possible administrative separation from the Navy.  AR 2011.  Dr. Klingenschmitt also requested that the Navy allow him to retire in lieu of

---

[15] This instruction states that "Chaplains are Qualified Religious Ministry Professionals (RMPs) endorsed by a Department of Defense (DOD) – listed Religious Organization (RO) and commissioned as CHC officers." U.S. Dep't of Navy, Sec. of the Navy Instr. 1730.7C, Religious Ministry within the Department of the Navy para. 5(a)(1) (21 Feb. 2006) [hereinafter SECNAVINST 1730.7C].

[16] This instruction states in pertinent part that the "Chief of Chaplains shall . . . . [n]otify Chief of Naval Personnel (CHNAVPERS) when an ecclesiastical endorsing agency withdraws its endorsementof a chaplain . . . . [and] [r]ecertify a chaplain's professional qualification upon receipt of a new ecclesiastical endorsement." U.S. Dep't of Navy, Office of the Chief of Naval Operations Instr.1120.9, Appointment of Officers in the Chaplain Corps of the Navy 5(b)(3)(a)(20 Dec. 2005) [hereinafter OPNAVINST 1120.9].

administrative separation.  AR 2011.  The Navy responded on October 11th, noting that all relevant materials had already been made available to Dr. Klingenschmitt and that Dr. Klingenschmitt was not entitled to retire as a matter of law, as he had not attained twenty years of creditable service.  AR 2020-21.

Dr. Klingenschmitt submitted a formal request for approval of his endorsement from the Chaplaincy of Full Gospel Churches on October 14, 2006.  AR 2023-24.  The Chief of Navy Chaplains convened a CARE board to, among other things, make a written recommendation whether to recertify Dr. Klingenschmitt's "professional qualification upon receipt of a new ecclesiastical endorsement."  AR 1980.  See OPNAVINST 1120.9, ¶ 5(b)(3) (setting forth professional qualifications for chaplains and procedures for verifying such qualifications).  By letter dated October 26, 2006, the CARE board recommended that "Lieutenant Klingenschmitt's request for the recertification of his professional qualifications upon receipt of a new ecclesiastical endorsement be denied."  AR 1978.

Both the Chief of Navy Chaplains and the Chief of Naval Personnel concurred with the CARE board's recommendation and further recommended to the Assistant Secretary of the Navy for Manpower and Reserve Affairs that Dr. Klingenschmitt's request for approval of his new endorsement be denied.  AR 1977, 1882-83.  The Assistant Secretary (acting on behalf of the Secretary) concurred.  See AR 1971-72.

On November 16, 2006, the Commander of the Navy Personnel Command informed Klingenschmitt that the Secretary had denied his request for approval of a new ecclesiastical endorsement pursuant to 10 U.S.C. § 643; DoDI 1304.28; and United States Department of the Navy, Secretary of Navy Instruction 1920.6C, Administrative Separation of Officers (15 Dec. 2005) [hereinafter SECNAVINST 1920.6C].  AR 1971-72.  Among other things, the letter explained:

> 2.      The Secretary determined you are professionally unsuited for further service as a naval officer and chaplain.  Presentation of a new ecclesiastical endorsement from a qualified religious organization does not automatically mandate recertification of a chaplain's professional qualification.  Rather, a new ecclesiastical endorsement is just one factor to be considered in evaluating whether a chaplain's professional qualification should be recertified.  Other factors include the officer's record of professional performance and accomplishment, disciplinary record, if any[,] and chain of command support.

> 3.      The Secretary concluded that your recent professional performance has been unsatisfactory.  Your most recent fitness report, for the period 23 July 2005 to 31 January 2006, graded you below average in the area of "military bearing/character," and the narrative noted that "he fails to meet standards of military bearing."  In addition, you were convicted at a special court-martial on 14 September 2006 for violating the lawful order [of] a superior commissioned officer.  Further, the Chief of Chaplains, your community leader, recommended denial of recertification and processing you for administrative separation.  The

Secretary concluded that you do not possess the character, leadership, or professional traits needed to successfully serve as a naval officer.

AR 1971. The letter also advised that the Secretary had ordered that Dr. Klingenschmitt be administratively separated from naval service and that Dr. Klingenschmitt separate by January 31, 2007, unless Dr. Klingenschmitt requested an earlier date of separation. Id.

## XII. Dr. Klingenschmitt's Lawsuit in the United States District Court for the District of Columbia

On October 25, 2006, the same day that the CARE board issued its recommendation to deny his recertification as a Navy chaplain, Dr. Klingenschmitt filed a complaint against the Secretary of the Navy in the United States District Court for the District of Columbia. Complaint, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. October 25, 2006). The complaint sought declaratory, injunctive, and compensatory relief for alleged constitutional and statutory violations committed by the Navy. Id. The complaint alleged four basic violations: (1) that the Navy violated its own rules and regulations by initiating separation proceedings against him after he resigned his ecclesiastical endorsement; (2) that the Navy was separating him in retaliation for his religious views and his criticism of the Navy's now rescinded regulation concerning religious elements at official command functions; (3) that the Navy restricted his free exercise of religion in violation of the First Amendment and RFRA; and (4) that the Navy unconstitutionally established a Unitarian religion. Id. at ¶¶ 105-131.

The day after filing his complaint in the district court, Dr. Klingenschmitt also filed a motion for a temporary restraining order (TRO) and a motion for preliminary injunction (PI) to stop the separation proceedings against him. Emergency Motion for Temporary Restraining Order, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. October 26, 2006), ECF No. 2. The district court denied Dr. Klingenschmitt's TRO request on November 1, 2006 and, two months later, denied the PI request as well. Order Denying Pl.'s Mot. TRO, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. November 1, 2006), ECF No. 5; Order Denying Pl.'s Mot. Preliminary Injunction, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. January 4, 2007), ECF No. 23.

Thereafter, on January 24, 2007, Dr. Klingenschmitt filed a notice of appeal from the district court order denying his motion for a preliminary injunction. Notice of Appeal, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. January 24, 2007), ECF No. 31. The United States Court of Appeals for the District of Columbia Circuit granted an administrative stay barring the Navy from effectuating Dr. Klingenschmitt's separation from the Navy in order that the court could consider his motion for an injunction pending appeal. Klingenschmitt v. Winter, 2007 U.S. App. LEXIS 2339 (D.C. Cir., Jan. 31, 2007). However, on February 27, 2007, the D.C. Circuit denied Dr. Klingenschmitt's motion for an injunction pending appeal and lifted the administrative stay of separation proceedings. Per Curiam Order, Klingenschmitt v. Winter, No. 07-5034 (D.C. Cir., February 27, 2007). Accordingly, Dr. Klingenschmitt was separated from the Navy on March 1, 2007. AR 1934.

On August 21, 2007, the district court entered an order dismissing Dr. Klingenschmitt's complaint. Order Dismissing Case, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. Aug. 21,

2007), ECF No. 46; see also Memorandum Opinion, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. Aug. 21, 2007), ECF No. 45. The court found that the term "recertify" in OPNAVINST 1120.9 did not, as Klingenschmitt contended, require the Chief of Chaplains to recertify Dr. Klingenschmitt solely because he had received a new ecclesiastical endorsement. Memorandum Opinion at 5, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. Aug. 21, 2007), ECF No. 45. The court held that, "[a]ccurately interpreted, then, the term 'recertify' refers to a decisionmaking process by which the Chief of Chaplains is required to determine whether a chaplain continues to enjoy 'professional qualification' and whether the chaplain's continuance with the Navy should be recommended." Id. The district court also held that the Navy's initiation of separation proceedings against Dr. Klingenschmitt could not have been retaliatory as it was required by regulation. Id. at 6. Finally, the district court held that Dr. Klingenschmitt lacked standing to bring his constitutional and statutory claims as he had already been separated from the Navy and was not prospectively threatened by Navy policies. Id. at 6-7.

Dr. Klingenschmitt appealed the district court's decision and, on April 14, 2008, the Court of Appeals for the D.C. Circuit affirmed the district court's dismissal. Klingenschmitt v. Winter, 275 F. App'x. 12 (D.C. Cir. 2008). The court of appeals noted that "[b]ecause mandatory, the Secretary's initiation of separation proceedings could not have been motivated by retaliatory animus." Id. at 13.

### XIII. Post Court-Martial Review

In the meantime, on December 22, 2006, while the district court action was pending, Dr. Klingenschmitt submitted matters in clemency to the court-martial convening authority pursuant to 10 U.S.C. § 860 and Rule for Courts-Martial 1105. AR 6-21. The Commander of Navy Region Mid-Atlantic considered Dr. Klingenschmitt's clemency matters, and, on January 2, 2007, he approved the court-martial sentence of a letter of reprimand but suspended the forfeitures for twelve months as recommended by the members of the court-martial. AR 2-3. The Commander of Navy Region Mid-Atlantic issued a written reprimand to Dr. Klingenschmitt on January 3, 2007 and, two days later, Dr. Klingenschmitt acknowledged receipt of the reprimand. AR 4-5.

On June 15, 2007, a Navy Force Judge Advocate reviewed Dr. Klingenschmitt's court-martial for error under 10 U.S.C. § 864. AR 2188-93. The judge advocate found that the findings and sentence were correct as to law and fact, and that no material error existed. Id. Dr. Klingenschmitt subsequently exercised his right under 10 U.S.C. § 869 to seek review by the Judge Advocate General of the Navy. AR 2151-87. Dr. Klingenschmitt asked that his conviction and sentence be dismissed or set aside, or that a rehearing at a court of appeals be granted. AR 2152. On June 15, 2009, the Judge Advocate General of the Navy denied Dr. Klingenschmitt's application for relief, finding that the evidence was legally and factually sufficient to support conviction and that there was no material error. AR 2148.

### XIV. The Board for Correction of Naval Records Upholds the 2005 and 2006 Fitness Reports

After his separation from the Navy, Dr. Klingenschmitt filed applications to the BCNR seeking the correction of his service record by removal of the two adverse fitness reports.  AR 2365, 2278.  Specifically, on February 11, 2008, Klingenschmitt requested that the BCNR "Delete/Remove the 18 Feb 05 fitness report signed by CAPT James Carr from [his] personnel record."  AR 2365.  He argued that the results of the January 2006 investigation of his grievances confirmed that Captain Carr had downgraded his evaluation "because I dared to quote 'exclusive' Bible verses in the base chapel during one optionally-attended Christian memorial service, and I prayed publicly 'in Jesus name.'"  AR 2365.  He alleged that the downgrade in the evaluation had violated his rights under the First Amendment and under 10 U.S.C. § 6031.

Before replying to Dr. Klingenschmitt, the BCNR sought an advisory opinion from Navy Personnel Command ("NPC").  AR 2420-21.  Navy Personnel Command responded by stating that it did not find any error in the fitness report.  AR 2406-07.  It noted that Dr. Klingenschmitt's grievances challenging the fitness report had been found without merit, that the promotion recommendation of "Must Promote" did not equate to a finding of deficient performance, that the comments and performance trait marks assigned to a member are "at the discretion of the reporting senior," that BUPERSINST 1610.10, unlike BUPERSINST 1610.10A, did not provide a member relief for a declining fitness report, and that Dr. Klingenschmitt did not prove the report to be in error.  AR 2406-07.

Dr. Klingenschmitt was allowed an opportunity to comment on NPC's advisory opinion.  AR 2408-17.  His response consisted essentially of a reiteration of his claims that his downgrading on the 2005 fitness report was punishment for the sermon he delivered at the 2004 memorial service.  AR 2409.  On June 6, 2008, the BCNR adopted the views of the advisory opinion and denied Dr. Klingenschmitt relief as to the January 2005 fitness report.  AR 2315-16.

On January 23, 2009, Dr. Klingenschmitt again petitioned the BCNR, this time requesting that the Board "[r]emove [the] 3 Feb 06 fitness report signed by CAPT L.E. Pyle from [his] service record."  AR 2278, 2281-91.  Dr. Klingenschmitt argued that the fitness report was unlawful under the MWPA because it punished him for making what he characterized as "protected whistleblower communications" to the President and members of Congress.  AR 2281.  He also alleged that allowing the fitness report to remain in his record  would "validate the religious harassment I experienced by the Chief of Navy Chaplains" and would violate "the spirit and letter of the U.S. Code, DoD Whistleblower Protection Statutes, SECNAV instructions, and the Spirit of human rights and military justice itself."  AR 2283.

Thereafter, on June 16, 2010, Dr. Klingenschmitt asked the Board to reconsider its June 5, 2008 decision upholding his January 2005 fitness report based on what he characterized as newly discovered evidence.  AR 2196-2215.  This evidence consisted of emails from Deputy Assistant Secretary of the Navy, Anita Blair, that he had secured through a request under the Freedom of Information Act, and that he argued were relevant to the question of whether Captain Carr acted unlawfully in criticizing him for the sermon he delivered at the 2004 memorial

service.  AR 2200-04.  He argued that the BCNR should set aside its earlier decision in light of this new "evidence" and First Amendment guarantees.  AR 2214.

The BCNR again sought an advisory opinion from NPC, and NPC found no error in the 2006 fitness report.  AR 2308-10.  Among other things, NPC noted that the Inspector General's Office had already found that Dr. Klingenschmitt's allegations of reprisal lacked merit and did not warrant further investigation under 10 U.S.C. § 1034.  AR 2308.  Navy Personnel Command found that nothing Dr. Klingenschmitt had submitted had proven that either the 2005 or 2006 fitness report was unjust or in error.    AR 2309.

Dr. Klingenschmitt submitted a rebuttal to NPC's advisory opinion.  AR 2311-13.  On May 7, 2009, the BCNR denied Dr. Klingenschmitt relief as to the January 2006 fitness report. AR 2216-17.  It stated that it concurred in the comments contained in the advisory opinion and that it was "unable to find the contested fitness report was the result of reprisal against you for protected communications, or discrimination against you because of your religious beliefs."  AR 2216.

Finally, on August 11, 2010, the BCNR issued a decision in response to Dr. Klingenschmitt's request for reconsideration of its June 2008 decision upholding his 2005 fitness report.  AR 2194.  Finding that Dr. Klingenschmitt presented no new material evidence, the BCNR denied Dr. Klingenschmitt's request.  AR 2194.

## XV. The Secretary of Defense Rejects Dr. Klingenschmitt's Appeal of the BCNR's Ruling on His Whistleblower Retaliation Claim

As noted, in challenging his 2006 fitness report before the BCNR, Dr. Klingenschmitt invoked the anti-retaliation provisions of the MWPA.  Under that Act, a member of the Armed Services who is dissatisfied with a decision of a correction board concerning his retaliation claim may file an appeal with the Secretary of Defense.  10 U.S.C. § 1034(g).  Dr. Klingenschmitt filed such an appeal by letter of July 21, 2009.  SAR 23-24.  On June 29, 2010, the Acting Deputy Undersecretary of Defense, on behalf of the Secretary, rejected the appeal finding no material error or injustice in the BCNR's decision.  SAR 1.

## DISCUSSION

### I. The Government's Motions to Dismiss

The Tucker Act empowers this court to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  While the Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does not confer any substantive rights on a plaintiff.  United States v. Testan, 424 U.S. 392, 398 (1976).  Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute,

regulation, or constitutional provision.  Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

The Military Pay Act, 37 U.S.C. § 204, "confers on an officer the right to the pay of the rank he was appointed to up until he is properly separated from the service."  Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (quoting Sanders v. United States, 594 F.2d 804, 810 (Ct. Cl. 1979) (en banc)).  Accordingly, the Military Pay Act "provides for suit in [the Court of Federal Claims] when the military, in violation of the Constitution, a statute, or a regulation, has denied military pay."  Antonellis v. United States, 723 F.3d 1328, 1331 (Fed. Cir. 2013) (quoting Dysart v. United States, 369 F.3d 1303, 1315 (Fed. Cir. 2004)).

In this case, Dr. Klingenschmitt alleges that he was wrongfully discharged from the Navy and seeks an award of backpay and allowances and benefits retroactive to his separation date and reinstatement as a chaplain.  Incident to that claim, he seeks removal of references to his 2005 and 2006 fitness reports and the CARE board's recommendation from his record.  Compl. ¶ CXVIII.  He also asks that the Court vacate his court-martial conviction and direct that references to the conviction, including the letter of reprimand issued pursuant to his conviction, be removed from his record.  Id.  Dr. Klingenschmitt's complaint also includes a potpourri of other claims that appear to challenge Navy policies which he claims violate the First Amendment, RFRA, and 10 U.S.C. § 6031(a).  See, e.g. Compl. ¶¶ CVII, CXIX, CXXIV (claiming that the now canceled SECNAVINST 1730.7C, governing religious ministry in the Navy, violated the Establishment Clause, RFRA, and DoD Directive 1350.2); Compl. ¶ CXXXII (claiming that the Navy "is trying to establish a Unitarian and pluralistic religion" in violation of the Establishment Clause).

The government acknowledges that the Tucker Act and the Military Pay Act confer jurisdiction on this Court to consider wrongful discharge claims.  See Def.'s Mot. 4, ECF No. 12 (April 11, 2012).  It also acknowledges that—to the extent Dr. Klingenschmitt's wrongful discharge claim is properly before the Court—the Court has jurisdiction over his claims related to the fitness reports as incident to the wrongful discharge claim.  See Def.'s Mot. 32.  Further, the government recognizes that if the wrongful discharge claim is properly before the Court, then the Court possesses jurisdiction to entertain a collateral attack on the court-martial conviction limited to the question of whether "in the court-martial proceedings there has been such a deprivation of fundamental fairness as to impair due process."  Matias v. United States, 923 F.2d 821, 826 (Fed. Cir. 1990) (quoting Bowling v. United States, 713 F.2d 1558, 1561 (Fed. Cir. 1983)).  See generally Oral Arg. Tr. 11-12.

Nonetheless, the government has moved to dismiss Dr. Klingenschmitt's complaint in its entirety under RCFC 12(b)(1) and 12(b)(6).  It argues that Dr. Klingenschmitt waived his right to judicial review of his wrongful discharge claim by failing to press it before the BCNR when he challenged his fitness reports.  Def.'s Mot. 23-26. Therefore, the government further argues, this Court lacks jurisdiction to consider his challenge to the BCNR's decisions regarding the fitness reports or his challenge to the court-martial because those claims do not seek money damages but rather are, at best, incidental to his claims for money in connection with the wrongful discharge.  Def.'s Mot. 26.  The government also argues that Dr. Klingenschmitt's claims under the MWPA are beyond this Court's jurisdiction and can only be pursued through the

administrative process set forth in that Act, with no right of judicial review.  Def.'s Mot. 29. Finally, the government contends that, absent authority to review the discharge, this Court lacks jurisdiction to consider Dr. Klingenschmitt's claims under the First Amendment and RFRA because those provisions do not mandate the payment of money damages by the government. Def.'s Mot. 29-31.

For the reasons set forth below, the Court finds:  (1) that Dr. Klingenschmitt did not waive his wrongful discharge claim; (2) that it has jurisdiction to review the BCNR's decisions regarding Dr. Klingenschmitt's fitness reports as incidental to his claim for money damages arising from his separation from the Navy; (3) that the Court has jurisdiction over Dr. Klingenschmitt's collateral attack on his court-martial conviction for the limited purpose of determining whether the court-martial proceedings were fundamentally fair and consistent with due process; (4) that the Court may consider Dr. Klingenschmitt's claims of retaliation under the First Amendment and RFRA in connection with its exercise of jurisdiction over his wrongful discharge claims and his challenges to the fitness reports;  (5) that the Court lacks jurisdiction over Dr. Klingenschmitt's claims under the MWPA;  and (6) that the Court lacks jurisdiction over Dr. Klingenschmitt's assorted standalone statutory and constitutional claims (including his challenges to Navy policies such as SECNAVINST 1730.7C).   Therefore, the government's motion to dismiss for failure to state a claim is **DENIED** and its motion to dismiss for lack of subject matter jurisdiction is **DENIED-IN-PART** and **GRANTED-IN-PART**.

## A. Motion to Dismiss for Failure to State a Claim:  Waiver of Wrongful Discharge Claim

In ruling on an RCFC 12(b)(6) motion to dismiss for failure to state a claim, the court accepts as true the complaint's undisputed factual allegations and construes them in the light most favorable to the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  While the court must draw all reasonable inferences in favor of the non-moving party, Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001), the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In other words, plaintiff's claim must be plausible on its face.  Id. at 570; Acceptance Ins. Cos., Inc. v. United States, 583 F.3d 849, 853 (Fed. Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

As noted, the Government has moved to dismiss the complaint under RCFC 12(b)(6) on the grounds that Dr. Klingenschmitt waived his right to judicial review of his wrongful discharge claim because he failed to challenge his discharge from the Navy when he asked the BCNR to remove his 2005 and 2006 fitness reports from his record.  The government relies upon Metz v. United States, 466 F.3d 991 (Fed. Cir. 2006), as well as the Federal Circuit's unpublished decision in Lewis v. United States, 476 F. App'x. 240 (Fed. Cir. 2012), in support of its waiver argument.  See Def.'s Mot. 23-26.  The government's contentions are unpersuasive.

It is well established that military correction boards provide a "permissive administrative remedy" for wrongful discharge and that "an application to a correction board is therefore not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge."   Martinez v. United States, 333 F.3d 1295, 1304 (Fed. Cir. 2003) (citing  Richey v. United States, 322 F.3d 1317, 1325 (Fed. Cir. 2003)); Heisig v. United States, 719 F.2d 1153, 1155 (Fed. Cir. 1983) ("[A]lthough relief has usually been first sought from military correction boards since their creation in 1946, there is here no requirement of exhaustion of administrative remedies prior to pursuit of judicial review.").   Nonetheless, if a plaintiff chooses to invoke this permissive administrative remedy and takes his wrongful discharge claim to a correction board, he must raise all arguments in support of his challenge to the discharge at the administrative level; he cannot raise new claims when seeking judicial review of the Board's decision in this Court.  See Metz, 466 F.3d at 999 (citing United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.")); see also Murakami v. United States, 398 F.3d 1342, 1354 (Fed. Cir. 2005) (affirming Court of Federal Claims' determination that plaintiff, who had failed to raise an argument before the Board, was precluded from raising that issue for the first time before the Court of Federal Claims).

The Metz case illustrates the application of this waiver rule.  In that case, the plaintiff tested positive for use of illegal drugs and requested separation from the service in lieu of a trial by court-martial.  466 F.3d at 993.  In accordance with his request, the plaintiff received a discharge under other than honorable conditions.  Id.  A year later, he had his sample retested and, based on the laboratory's finding that the sample was tainted, he raised a wrongful discharge claim before the Air Force Board for Correction of Military Records.  Id. at 993-94.  The Board rejected his challenge in part on the grounds that he had voluntarily requested separation from the service rather than face a court-martial.  Id. at 994.  In seeking review before the Court of Federal Claims, the plaintiff argued for the first time that his separation was involuntary because he had received ineffective assistance of counsel in responding to the court-martial charges against him.  Id. at 995.  The Federal Circuit held that because plaintiff did not raise this argument before the Board, he waived his right to challenge the voluntariness of his separation before the court.  Id. at 999.

The ruling in Metz was based on longstanding principles regarding the scope of judicial review of administrative action.  As the Court of Claims explained in Doyle v. United States, the waiver doctrine "requires that known objections be made to the agency" and is applied to ensure that administrative agencies are "afforded an opportunity to make adjustments and correct errors on the administrative level."  599 F.2d 984, 1001 (Ct. Cl. 1979), amended by 609 F.2d 990.  Therefore, if a party elects to bring a claim before an administrative agency, it must give that agency the opportunity to resolve all issues relevant to the adjudication of that claim, and it cannot save some arguments for an initial airing before the court on review of the agency's decision.  See id.  "Any other rule" the court explained, "would not give proper regard to the broad powers of the agency to correct errors, would be wasteful of the good faith effort and expense undertaken by the Secretary in this case, and would not accord with principles of justice."  599 F.2d at 1001.

The government's reliance on these principles to support its argument that Dr. Klingenschmitt waived his wrongful discharge claim is misplaced.  Critically, unlike the plaintiff in Metz, Dr. Klingenschmitt did not raise any claim at all before the BCNR concerning the lawfulness of his separation from the service.  Instead, the only claims before the Board were his requests to remove the fitness reports from his record.   See AR 2278, 2281-91, 2365.  In this case, unlike in Metz, the full resolution of the claims presented to the Board (concerning the fitness reports) did not require the Board to consider in any way the circumstances under which Dr. Klingenschmitt was separated from the service.  Similarly, Dr. Klingenschmitt is not asking this Court to consider arguments concerning the validity of the fitness reports that he did not make to the Board.  In short, the rationale of Metz and similar cases is inapplicable, and the policies that those cases promote—allowing an agency to correct its own errors and respecting the administrative process—are not implicated here.

The primary case upon which the government relies in support of its waiver argument is the Federal Circuit's unpublished decision in Lewis v. United States, 476 F. App'x. 240 (Fed. Cir. 2012).   Lewis, however, is both non-binding and distinguishable.  It does not support the government's overbroad reading of Doyle, Metz, and other published Federal Circuit precedent.

In Lewis, the plaintiff was a veteran who had received a general discharge under honorable conditions for the convenience of the government based on his personality disorder.  476 F. App'x. at 242.  He unsuccessfully petitioned the Corrections Board to amend his records to show that he had retired on a disability.  Id.  The BCNR concluded that plaintiff was not "unfit for service by reason of physical disability at the time of his discharge."  Lewis v. United States, 2009 U.S. Claims LEXIS 358, *5-6 (2009) (citing the administrative record).  In seeking review of the Board's adverse decision in the Court of Federal Claims, the plaintiff sought to press claims of wrongful discharge based on whistleblower retaliation and violations of his constitutional rights.  Id. at *6.  The court of appeals held that plaintiff had waived his wrongful discharge claims by not presenting them to the Board in connection with his request that his record be amended to show that he had been retired on a disability.  476 F. App'x. at 244.

As is readily apparent, Lewis involved a straightforward application of the principles set forth in Doyle and Metz and their progeny.  Plaintiff could not bring his wrongful discharge claim to this court because he had withheld from the Board arguments relevant to his request to treat his separation as a retirement based on disability.  He sought to raise, for the first time in this court, new arguments that he was wrongfully discharged.  Lewis is distinguishable from the present case because Dr. Klingenschmitt does not ask this Court to address any arguments regarding the validity of his fitness reports that he did not raise before the Board.

In short, the Court finds the government's waiver argument unpersuasive.  Accordingly, its motion to dismiss Dr. Klingenschmitt's wrongful discharge claim for failure to state a claim is **DENIED**.

### B. Motion to Dismiss for Lack of Jurisdiction

In ruling on a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court accepts as true all undisputed facts in the plaintiff's complaint and draws all reasonable inferences in favor of the plaintiff.  Trusted Integration, Inc. v. United States, 659

F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiff, however, bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013); Trusted Integration, Inc., 659 F.3d at 1163.

As noted above, the Military Pay Act "provides for suit in the Court of Federal Claims when the military, in violation of the Constitution, a statute, or a regulation, has denied military pay." Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir. 2006) (quoting Dysart v. United States, 369 F.3d 1303, 1315 (Fed. Cir. 2004)).  Further, "[t]he presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the discharge was wrongful." Id.  Thus, where the service member alleges that his discharge was wrongful on constitutional, statutory, or regulatory grounds, determination of the merits of the claim "may include consideration of whether his removal violated [his] constitutional rights." Holley, 124 F.3d at 1466.  The "constitutional [and statutory] issue does not stand alone, but is a factor in the claim for which Tucker Act jurisdiction is established." Id.

In this case, the government argues that this Court lacks jurisdiction to consider Dr. Klingenschmitt's claims under the First Amendment and RFRA.  The government's argument appears to be premised on the notion (found to lack merit above) that Dr. Klingenschmitt's wrongful discharge claim is not properly before the Court.  In light of the Court's conclusion that the wrongful discharge claim has not been waived, it is clear under Holley that the Court possesses jurisdiction to decide Dr. Klingenschmitt's First Amendment claims in connection with its review of his wrongful discharge.

The same rationale applies with respect to Dr. Klingenschmitt's claim that his discharge violated RFRA.[17]  As the D.C. Circuit has observed, "RFRA's judicial relief provision is couched in broad terms:  'A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.'" Webman v. Fed. Bureau of Prisons, 441 F.3d 1022, 1024 (D.C. Cir. 2006) (emphasis in original) (quoting 42 U.S.C. § 2000bb-1(c)).  See 42 U.S.C. § 2000bb-2(1) (providing that "the term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States").

---

[17] Congress enacted RFRA for the express purpose of codifying the standard of review that the Supreme Court had established in Sherbert v. Verner, 374 U.S. 398 (1963), for determining the constitutionality of facially neutral government policies that burden the exercise of religious beliefs. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 (2006). The Court had rejected the application of the Sherbert standard as a matter of constitutional law in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990). Id. RFRA adopts the Sherbert standard as a matter of statutory right, providing that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government can demonstrate that the application of the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).

The Act itself does not provide a damages remedy or waive the government's sovereign immunity with respect to a claim for damages.  Webman, 441 F.3d at 1025-26 (holding that RFRA's waiver of sovereign immunity did not extend to monetary damages; the Act's reference to "appropriate relief" was susceptible to more than one interpretation, and thus was not an unambiguous waiver of sovereign immunity).  Nonetheless, as noted, it does specifically authorize RFRA violations to be considered in connection with a claim or defense that is otherwise within the jurisdiction of the court.  See 42 U.S.C. § 2000bb-1(c).  Accordingly, the Court has jurisdiction to consider whether RFRA was violated in the context of deciding whether Dr. Klingenschmitt was discharged in violation of law, and may award damages based on the waiver of sovereign immunity in the Tucker Act coupled with the Military Pay Act.

On the other hand, the Court lacks jurisdiction to adjudicate the constitutional and statutory claims in Dr. Klingenschmitt's complaint that seek to challenge Navy policies such as SECNAVINST 1730.7C or other policies that are not directly related to Klingenschmitt's wrongful discharge claim.  Because it is not necessary to address Dr. Klingenschmitt's constitutional and statutory objections to such policies in order to adjudicate his claim for money damages for wrongful discharge, the Tucker Act does not supply a basis for this Court's jurisdiction over those claims.  See Volk v. United States, 111 Fed. Cl. 313, 326 (2013) (observing that there is no Tucker Act jurisdiction over standalone constitutional claims in Military Pay Act case).  Cf. Filipiczyk v. United States, 88 Fed. Cl. 776, 784 (2009) (citing Holley, 124 F.3d at 1466) (holding that there is no Tucker Act jurisdiction where claims under non-money mandating sources of law "constitute independent causes of action and not 'factor[s]' in . . . claims brought under the arguably money-mandating per diem statute and regulation").

In addition to his arguments under the First Amendment and RFRA, Dr. Klingenschmitt contends that his discharge was unlawful because it violated the MWPA.  Pl.'s Mot. 24, ECF No. 18 (July 9, 2012).  The Court lacks jurisdiction to consider this claim, however, because Congress intended that MWPA claims be adjudicated under the detailed administrative process set forth in the statute and because Klingenschmitt did not challenge his discharge through that scheme.

The MWPA was designed "to provide channels within the military through which members of the armed forces could bring their grievances."  Hernandez v. United States, 38 Fed. Cl. 532, 536 (1997).  To that end, the statute provides a fairly elaborate administrative process for handling complaints of retaliatory personnel actions that commences with a complaint filed with the Inspector General and can culminate in an appeal to the Secretary of Defense.  10 U.S.C. § 1034(c)-(h).

The existence of this comprehensive scheme establishes that Congress did not intend to provide plaintiffs with a private cause of action to enforce their rights under the MWPA in court.  Soeken v. United States, 47 Fed. Cl. 430, 433 (2000) (observing that the Act "provides solely an administrative process for handling complaints of improper retaliatory personnel actions"); see also Acquisto v. United States, 70 F.3d 1010, 1011 (8th Cir. 1995) (holding that comprehensive administrative scheme signals that Congress did not intend to permit service members to assert a private cause of action in federal court under the MWPA).  Instead, to the extent that Dr. Klingenschmitt wished to challenge his removal under the MWPA, he was required to follow the

administrative scheme set forth in that Act.  Accordingly, the government's motion to dismiss under RCFC 12(b)(1) is **GRANTED** as to Dr. Klingenschmitt's claims that his removal violated the MWPA.

## II. Motion for Judgment on the Administrative Record

### A. Standard of Review

RCFC 52.1 governs motions for judgment on the administrative record.  See RCFC 52.1(c).  Therefore, the standard of review for a motion for judgment on the administrative record differs from that for a motion for summary judgment.  Bannum, Inc. v. United States, 404 F.3d 1346, 1354-55 (Fed. Cir. 2005).  Unlike summary judgment, for instance, "a genuine dispute of material fact does not preclude a judgment on the administrative record."  Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 751 (2012) (citing Bannum, Inc., 404 F.3d at 1355-56).  To the contrary, "[t]o review a motion or cross-motions under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 630 (2014) (citing Bannum, Inc., 404 F.3d at 1356-57); see also RCFC 52.1 Rules Committee Note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record.").  "The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding."  CRAssocss., Inc. v. United States, 102 Fed. Cl. 698, 710 (2011) (citing, inter alia, Bannum, Inc., 404 F.3d at 1356))

### B. The 2005 and 2006 Fitness Reports

As noted above, this Court reviews the BCNR's decisions refusing to remove the 2005 and 2006 fitness reports from Dr. Klingenschmitt's record as incidental to its adjudication of Dr. Klingenschmitt's wrongful discharge claim, which is the basis of his claim for money damages. For the reasons set forth below, the Court finds no basis for disturbing the BCNR's decisions regarding the validity of the 2005 and 2006 fitness reports.

The scope of judicial review of military correction board decisions is a deferential one and is "limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting Heisig, 719 F.2d at 1156).  The arbitrary and capricious standard of review "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence."  Heisig, 719 F.2d at 1157.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  The court is limited to a review of the record that was before the corrections board. Metz, 466 F.3d at 998; see also Walls v. United States, 582 F.3d 1358, 1368 (Fed. Cir. 2009). Finally, it may not "substitute [its] judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence."  Heisig, 719 F.2d at 1156.

Dr. Klingenschmitt argues that the BCNR's decisions refusing to remove the 2005 and 2006 fitness reports from his records were arbitrary and capricious and not supported by substantial evidence. Specifically, he argues that the BCNR "merely rubber stamped the 'advisory opinions' provided by the Navy" and that its failure to find that the fitness reports "were the result of Chaplain Klingenschmitt's religious beliefs" was irrational because of the existence of what he calls "smoking guns to the contrary." Pl.'s Mot. 46-47. In particular, Dr. Klingenschmitt argues that it was irrational for the BCNR not to find a causal connection between the downgraded fitness reports and the Navy's alleged displeasure with his sermons and with his advocacy concerning the Navy's policies for chaplains. Id. at 48.

The Court finds these arguments unpersuasive. To the extent that Dr. Klingenschmitt is asking the Court to second guess the evaluation of his performance or his superiors' assessment of his promotion potential, such claims are nonjusticiable because "[a] court lacks the special expertise needed to review . . . officers' records and rank them on the basis of relative merit." Antonellis, 723 F.3d at 1332 (quoting Sargisson v. United States, 913 F.2d 918, 922 (Fed. Cir. 1990)). Review is therefore limited to whether there has been a violation of a specific procedure mandated by law or regulation. Antonellis, 723 F.3d at 1332; see also Lewis, 458 F.3d at 1377 ("In general, we have said that the questions of the fitness of an officer to serve on active duty, and in what capacity the officer should serve, are not for the courts to decide."); Dysart, 369 F.3d at 1315 ("[T]he subject of military promotions is beyond the competence of courts to review."); Savio v. United States, 213 Ct. Cl. 737, 740 (1977) (stating that "ratings and promotions are discretionary matters in which the court will scrupulously not intervene unless relief is mandated by law.").

As described below, Dr. Klingenschmitt has failed to identify a specific law, rule, or regulation that was violated with respect to either of his fitness reports. Further, substantial evidence supports the BCNR's conclusions rejecting Dr. Klingenschmitt's allegations that the downgraded fitness reports were the product of retaliation for Dr. Klingenschmitt's exercise of his First Amendment rights. Therefore, the Court finds meritless Dr. Klingenschmitt's objections to the Navy's consideration of those fitness reports in deciding whether or not to recertify him as a chaplain.

### 1. The 2005 Fitness Report

First, with respect to the 2005 Report, the BCNR found no merit to Dr. Klingenschmitt's claims that the declining recommendation in the report (from "Early Promote" to "Must Promote") was based on his exercise of his claimed First Amendment right "to quote 'exclusive' Bible verses in the base chapel during one optionally-attended Christian memorial service," or to "pray[] publicly 'in Jesus name.'" AR 2365; see Pl.'s Mot. 5 (asserting that "Chaplain Klingenschmitt received a downgraded fitness report, for the period ending January 31, 2005, in reprisal for the content of the Chaplain's prayers and sermons, based on his religious beliefs."). After giving Dr. Klingenschmitt an opportunity to respond, the BCNR adopted the views contained in the NPC's advisory opinion. AR 2315-16. That opinion, in turn, was based upon an extensive internal investigation of Dr. Klingenschmitt's Article 138 grievance, which had pressed essentially the same allegations of retaliation for the exercise of First Amendment rights

27

that Dr. Klingenschmitt presented to the BCNR regarding his 2005 fitness report.  See AR 2129-46.

The advisory opinion noted that Dr. Klingenschmitt's grievances challenging the fitness report had been found without merit, that the promotion recommendation of "must promote" did not equate to a finding of deficient performance, that the comments and performance trait marks assigned to a member are "at the discretion of the reporting senior," and that Dr. Klingenschmitt did not prove the report to be in error.  AR 2406-07.  The BCNR's adoption of this rationale was neither arbitrary nor capricious.

The record before the Board here revealed that the ratings and "Must Promote" recommendation in the 2005 fitness report were based on the results of the command survey that Captain Carr conducted as part of his oversight of the religious ministries program.  That survey had uncovered a significant amount of dissatisfaction with Dr. Klingenschmitt's performance among the sailors he served on the USS Anzio.  AR 2451-52.

Dr. Klingenschmitt has not identified any law, rule, or regulation that precluded his superiors from taking the survey results into consideration in assigning him a "Must Promote" rather than "Early Promote" recommendation.  And he has not identified any basis in law or regulation to challenge the numerical ratings that were assigned in the report, other than conclusory arguments that such ratings could only have been based on animus toward Dr. Klingenschmitt based on his religious expression.

Finally, because the BCNR reasonably concluded that the ratings in the 2005 fitness report were based on the survey results, and not on the content of the sermon Dr. Klingenschmitt delivered at the 2004 memorial service, it is unnecessary for the Court to address Dr. Klingenschmitt's argument that he had a right under the First Amendment or under 10 U.S.C. § 6031 to express the sentiments he conveyed during that sermon.  Even assuming such a right existed (a matter on which the Court expresses no opinion), the BCNR reasonably found that there was no cause and effect relationship between the sermon and the downgraded fitness report.[18]  The downgraded fitness report was based on the survey which concerned his overall

---

[18] For similar reasons, the Court has no occasion to address Dr. Klingenschmitt's arguments that his rights under RFRA were violated by either the 2005 or 2006 fitness report. Pl.'s Mot. 36. RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" except "in furtherance of a compelling governmental interest" and by "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb–1(a), (b).  This provision is invoked where a plaintiff alleges that a facially neutral policy or action has the incidental effect of burdening the exercise of their religious beliefs.  See, e.g., Gonzales, 546 U.S. 418 (challenging a provision of the Controlled Substances Act criminalizing hallucinogens used by a religious sect as part of communion).  The only analogous policy that Dr. Klingenschmitt identifies here, so far as the Court can discern from his briefs, is an alleged policy of requiring chaplains' prayers and sermons to be non-sectarian in nature whenever they are delivered in a public setting.  Even assuming that such a policy violated RFRA (an issue on which the Court expresses no opinion),

performance as a chaplain, not the content of the sermon. Accordingly, the BCNR's conclusion rejecting Dr. Klingenschmitt's argument that the findings in the 2005 fitness report were motivated by animus against him based on protected activity was neither arbitrary nor capricious, but was supported by substantial evidence drawn from the investigation of Dr. Klingenschmitt's grievances and a review of the entire record before the Board.[19]

## 2. The 2006 Fitness Report

Dr. Klingenschmitt's challenge to the BCNR's decision declining to remove his 2006 fitness report from his record is similarly meritless. As described above, that report was critical of Dr. Klingenschmitt for removing his uniform "in a public setting and in the presence of media," and for "[o]penly challeng[ing] the authority of his chain of command" through, among other things, "intemperate" statements to the media and on his website in reference to senior leadership. AR 1869. The report further advised that Dr. Klingenschmitt "needs to improve his military bearing and professionalism in order to become a more effective Naval Officer." Id. Finally, it contained a recommendation of "Promotable" which was a further decline from the recommendation of "Must Promote" in the 2005 report. Id. See AR 1881.

Dr. Klingenschmitt argued before the Board that the 2006 fitness report was unlawful because it punished him for making what he characterized as "protected whistleblower communications to the President and members of Congress." AR 2278. He characterized those "communications" as complaints "accusing senior Naval officials, including the Chief of Navy Chaplains, of violating their oath to support and defend the Constitution, specifically by engaging in religious harassment and discrimination against me, a junior chaplain under their control, by censoring and threatening to censor the content of my public prayers." AR 2281.

In rejecting Dr. Klingenschmitt's claims, the BCNR again relied upon the reasoning in an advisory opinion from NPC. That opinion noted that the Inspector General's Office had already found that Dr. Klingenschmitt's allegations of reprisal lacked merit and did not warrant further

---

the declined fitness reports were not based on the application of that policy to Dr. Klingenschmitt. Therefore, Dr. Klingenschmitt's arguments based on RFRA have no bearing on the BCNR's decisions not to remove the fitness reports from his record.

[19] The Board also acted well within its discretion in rejecting Dr. Klingenschmitt's June 26, 2010 request for reconsideration of its decision regarding the 2005 fitness report because he had not presented any new material evidence in support of that request. The BCNR concluded that the information that he submitted—consisting of, among other things, emails from Deputy Assistant Secretary of the Navy Anita Blair concerning the proper interpretation of Navy policies in the context of the sermon that Dr. Klingenschmitt delivered at the 2004 memorial service—had no bearing on his allegations regarding the fitness report. See AR 2194. The BCNR's conclusion in that regard was reasonable because, as it determined in its original decision, the ratings and recommendations in the fitness report were legitimately based on the results of the survey Captain Carr conducted, and not on Dr. Klingenschmitt's sermon.

investigation under the MWPA.  Thus, the Inspector General had concluded that Dr. Klingenschmitt's unfavorable 2006 report, which found that he failed to meet accepted standards of military bearing, was justified by the fact that he "used intemperate language when referring to senior naval officers in his publicly accessible website, told his department head that he did not accept his authority or the authority of the Commanding Officer, and removed portions of his uniform in the presence of the media."  AR 2274.  In addition, the advisory opinion further noted that the 2006 fitness report had been prepared consistent with governing rules and that Captain Pyle had justified the "decline in performance" and the ratings through the narrative comments in the report.  AR 2309.

Upon consideration of the entire record, "the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice" with respect to the 2006 report.  AR 2216.  It noted that it "substantially concurred with the comments contained in the advisory opinion" and that it was "unable to find the contested fitness report was the result of reprisal against you for protected communications, or discrimination against you because of your religious beliefs."  AR 2216.

Dr. Klingenschmitt exercised his rights under 10 U.S.C. § 1034(g) to appeal to the Secretary of Defense the BCNR's disposition of his claims that the 2006 fitness report constituted retaliation under the MWPA.  Because, as noted above, this Court lacks jurisdiction to review MWPA claims, it considers itself bound by the Secretary's conclusion that the 2006 report was not the product of retaliation for whistleblowing within the meaning of the MWPA.

As to the other bases Dr. Klingenschmitt asserted for challenging the 2006 fitness report (i.e. religious discrimination), the Board's decision was neither arbitrary nor capricious, and its conclusions were supported by substantial evidence.  Thus, Dr. Klingenschmitt does not deny that he engaged in the offending conduct identified in the narrative in his fitness report.  Beyond making conclusory statements that the report was the product of retaliatory animus against him (see Pl.'s Mot. 26, asserting that "the fitness reports . . . were the results of religious persecution by a newly secular military terrorized by political correction"), he provides no grounds upon which the Court could properly disturb the Board's findings or its determination.

Ultimately, as with the 2005 fitness report, Dr. Klingenschmitt's challenge to the BCNR's determination regarding the validity of the 2006 report relies entirely upon an argument that Dr. Klingenschmitt's activities and public pronouncements about Navy policy (which he characterizes as part of a "crusade to restore religious freedom") had angered Navy officials.  See Pl.'s Mot. 48 (observing that "[i]t takes no great leap of faith to decide that high Navy officials were angry at Chaplain Klingenschmitt").  According to Dr. Klingenschmitt, in rejecting his claim of discrimination based on protected activity, the Board failed to "read between the lines and make reasonable inferences."  Pl.'s Mot. 48.

Dr. Klingenschmitt again fails to appreciate that the BCNR's decision declining to draw an inference of retaliatory motives was based on the narratives in the 2006 fitness report, whose factual basis Dr. Klingenschmitt does not challenge.  On its face, the enumeration of acts of improper conduct by Dr. Klingenschmitt contained in the report provided ample support for the ratings contained in the report.  Those acts provided a sufficient basis to permit the BCNR to find

that any protected activities by Dr. Klingenschmitt were not the but-for cause of the downgraded report.  His claims based on the First Amendment and RFRA are, accordingly, unavailing.[20]

### C. The Collateral Attack on the Court-Martial

Dr. Klingenschmitt requests the removal of the court-martial conviction and all related matters (including the letter of reprimand) from his record.  He contends that Captain Pyle's Order not to wear his uniform at the March 30, 2006 media event was unlawful within the meaning of United States v. Wine, 28 M.J. 688 (A.F.C.M.R. 1989), unconstitutional under the First Amendment and the Due Process Clause, and in violation of RFRA.  Pl.'s Mot. 28-32.  He further contends that the court-martial should be set aside because it was tainted by impermissible command influence, in violation of 10 U.S.C. § 837.  Pl.'s Mot. 32-36.

As noted above, the Court has jurisdiction to hear collateral attacks upon a court-martial conviction where the conviction has back pay and monetary consequences.  Matias, 923 F.2d at 823-25.  Here, such monetary consequences arise out of the fact that the court-martial conviction played a role in the Navy's decision not to recertify Dr. Klingenschmitt as a chaplain, which resulted in his discharge.  The scope of review in such cases is extremely limited, however, encompassing only "issues that address the fundamental fairness in military proceedings and the constitutional guarantee of due process."  Id. at 826 (citations omitted).  In order to prevail, the plaintiff must "demonstrate convincingly that in the court-martial proceedings there has been such a deprivation of fundamental fairness as to impair due process."  Id. (citations omitted).  Dr. Klingenschmitt has not met this burden.

First, Dr. Klingenschmitt's arguments regarding the lawfulness of Captain Pyle's Order (which he unsuccessfully litigated before the court-martial) do not go to the question of whether

---

[20]In his opening brief, Dr. Klingenschmitt argues that under the MWPA, 10 U.S.C. § 1034(f), the BCNR should have conducted a further inquiry into his allegations of whistleblower retaliation and that its failure to do so was arbitrary and capricious.  Pl.'s Mot. 49.  Even assuming that the Court has jurisdiction to consider this claim (which is based on the provisions of the MWPA), Dr. Klingenschmitt's contention lacks merit.  First, the relevant statutory provision is 10 U.S.C. § 1034(g), not 10 U.S.C. § 1034(f).  And that provision does not require the Board to conduct additional inquiries into allegations of whistleblower reprisal whenever a claim is made that a personnel action prohibited by the MWPA has been taken.  Instead, it requires that the Board review the report of any investigation of a whistleblower complaint that was conducted by an Inspector General in accordance with 10 U.S.C. § 1034(c), and states that upon the review of such report, the Board "may request the Inspector General to gather further evidence" and may hold an evidentiary hearing "if appropriate."  10 U.S.C. § 1034(g).  In this case, there was no report of investigation to review because the Inspector General concluded that the allegations in Dr. Klingenschmitt's complaint did not merit an investigation.  See 10 U.S.C. § 1034(c)(4)(C).  In that light, and given the rest of the record before the Board, it was hardly arbitrary for the Board not to request that the Inspector General conduct a further inquiry and not to hold an evidentiary hearing.

the court-martial proceedings themselves were fundamentally unfair and violative of due process.  Rather, the lawfulness of the Order is relevant to the underlying merits of the conviction.  Therefore, those arguments do not concern matters within the Court's scope of review of the court-martial.  Bowling v. United States, 713 F.2d at 1561 ("[I]t is not the duty of the civil courts simply to repeat [the court-martial] process—to reexamine and reweigh each item of evidence . . . . It is the limited function of the civil courts to determine whether the military have [sic] given fair consideration to each of these claims." (quoting Burns v. Wilson, 346 U.S. 137, 144 (1953))); see also Matias v. United States, 19 Cl. Ct. 635, 638 (Cl. Ct. 1990) ("If fair consideration has been given to the allegations presented during the court-martial trial and the review process, then the civil courts should refrain from asserting jurisdiction and substituting [their] judgment for that of the military courts.").

Dr. Klingenschmitt's second contention is that the court-martial proceedings were fundamentally unfair because they were tainted by impermissible "command influence." Pl.'s Mot. 33.[21]  Of the several examples of alleged improper command influence set forth in his brief, however, only one—the allegation that the convening authority of the court-martial, Admiral Ruehe, Commander Navy Religion Mid-Atlantic, was an accuser—was raised before the court-martial.  Pl.'s Mot. 35 (citing AR 1152-71).  The other objections based on allegedly improper command influence were not raised and are therefore waived.  See Martinez v. United States, 914 F.2d 1486, 1488 (Fed. Cir. 1990) (holding that plaintiff's "failure to raise his constitutional claims in the military court system bars him from raising them in federal court").

Dr. Klingenschmitt argues that improper command influence was exercised in the court-martial because, he alleges that Admiral Ruehe who convened the court-martial, was an accuser in the case.  Specifically, he argues, Admiral Ruehe "had to deal with Chaplain Klingenschmitt through Art. 138 complaints, Art. 1150 complaints, news inquiries and hunger strikes" and that, in addition, "[h]e had to spend time in discussion with the Chief of Chaplains and even the office of the Chief of Naval Operations and the Judge Advocate General."  Pl.'s Mot. 36.

An accuser is an individual who is "so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter."  United States v. Voorhees, 50 M.J. 494, 499 (C.A.A.F. 1999) (citations omitted).  The military judge addressed the command influence issue at AR 1775 and concluded that Admiral Ruehe did not have a personal interest in the matter, but rather was discharging his duties as Regional Commander in referring

---

[21]Article 37 of the UCMJ, 10 U.S.C. § 837, prohibits improper command influence at courts-martial and other military tribunals.  The purpose of the provision is to "assure to all in the military service an absolutely fair trial in which findings and sentence are determined solely upon evidence, and free from all unlawful influence exerted by any military superior."  United States v. Navarre, 5 U.S.C.M.A. 32, 37 (1954).  "Command influence may be found to exist if a reasonable citizen, knowing all of the facts of a given case, would believe the military justice system to be unfair, and, as such, lose confidence in the entire system."  N.G. v. United States, 94 Fed. Cl. 375, 387 (2010) (citing United States v. Lawson, 33 M.J. 946, 950 (N.M.C.M.R. 1991)).

the charges against Dr. Klingenschmitt for trial.  AR 1777.  His involvement in matters related to Dr. Klingenschmitt's grievances and other complaints was part of his official duties.  Id.  The Court agrees that "[n]o reasonable person, knowing the facts as they exist in [Klingenschmitt's] case, would conclude that the Regional Commander's actions have been anything other than those of an officer discharging his various duties."  AR 1777.  Accordingly, Dr. Klingenschmitt has failed to make the convincing demonstration of fundamental unfairness required to grant his request that the court-martial conviction be vacated.

### D. Wrongful Discharge

Finally, the Court turns to Dr. Klingenschmitt's contention that the decision not to recertify him as a chaplain after he lost his ecclesiastical endorsement was arbitrary, capricious and/or contrary to law.  Pl.'s Mot. 39.  In addressing this challenge, the Court is again mindful of the Federal Circuit's admonition that the decisions of military officials regarding which individuals are fit to serve and in what capacity "are not for the courts to decide."  Lewis, 458 F.3d at 1377.  Thus, in order to secure relief here, Dr. Klingenschmitt must demonstrate that the failure to recertify him and the decision to separate him violated a law, rule, or regulation.  Id.  It is clear that Dr. Klingenschmitt has failed to make this demonstration.

The Secretary of Defense has the statutory authority to issue regulations concerning the discharge of a military chaplain who "fails to maintain the qualifications needed to perform his professional function."  10 U.S.C. § 643.  In accordance with that authority, the Secretary published DoDI 1304.28, entitled "Guidance for the Appointment of Chaplains for the Military Departments."  That Instruction provides that if a chaplain's ecclesiastical endorsement is ever withdrawn, "[p]rocessing for separation in accordance with [10 U.S.C. § 643] shall be initiated immediately [upon receipt of notice of the withdrawal]."  DoDI 1304.28, ¶ 6.5.  See Klingenschmitt v. Winter, 275 F. App'x. 12, 13 (D.C. Cir. 2008) (holding that institution of separation proceedings was mandatory under applicable regulations once Dr. Klingenschmitt lost his ecclesiastical endorsement); see also SECNAVINST 1920.6C (19 Sept. 2007), Enclosure (3) at ¶ 17 (stating that a chaplain who can no longer continue service as a chaplain because an ecclesiastical endorsing agency has withdrawn its endorsement shall be processed for separation per [DoDI 1304.28]).[22]

Once the process is initiated, the chaplain must be advised of, among other things, his right to counsel and of his option to seek another ecclesiastical endorsement, apply for non-chaplain duties or voluntary retirement, or tender a resignation.  DoDI 1304.28, ¶¶ 6.5.1.1, 6.5.1.3.  Dr. Klingenschmitt chose to seek recertification as a chaplain.  AR 2025.

As the district court observed in rejecting Dr. Klingenschmitt's challenge to the initiation of separation proceedings against him, "DoDI 1304.28 makes it abundantly clear that where a chaplain seeks to have her qualifications recertified (pursuant to ¶ 6.5.1.3), that recertification is

---

[22] According to amendments issued to SECNAVINST 1920.6C on September 19, 2007, "[t]his paragraph was unintentionally left out of [the15 December 2005] version of this instruction."  SECNAVINST 1920.6C Change Transmittal 1.

not automatic and is subject to the approval (i.e., the certification) of the Department Secretary." Memorandum Opinion at 4, <u>Klingenschmitt v. Winter</u>, No. 06-01832 (D.D.C. Aug. 21, 2007) (citations omitted).  The Navy's regulations track these directives.  <u>Id.</u> (citing OPNAVINST 1120.9).  Recertification involves "a decisionmaking process by which the Chief of Chaplains is required to determine whether a chaplain continues to enjoy 'professional qualification' and whether the chaplain's continuance with the Navy should be recommended."  <u>Id.</u> at 5 (quoting OPNAVIST 1120.9, ¶ 5(b)(3)(a)).  Use of a CARE board to assist the Chief of Chaplains in making his recommendation is appropriate under the regulations.  <u>Id.</u> at 5 n.3.

The administrative record before the Court reveals that these procedures were followed in connection with Dr. Klingenschmitt's separation.  As described in greater detail above, after Dr. Klingenschmitt lost his ecclesiastical endorsement from the Evangelical Episcopal Church, he submitted a formal request for approval of his endorsement from the Chaplaincy of Full Gospel Churches.  AR 2001-02.  The Chief of Navy Chaplains then convened a CARE board to make recommendations regarding whether Klingenschmitt should be recertified.  AR1980.  The CARE board considered Dr. Klingenschmitt's service record and the materials he submitted in support of his recertification, and recommended that his request for recertification be denied.  AR 1978-1979.  The Chief of Navy Chaplains and the Chief of Naval Personnel concurred with this recommendation and further recommended to the Assistant Secretary of the Navy for Manpower and Reserve Affairs that Klingenschmitt's request for approval of his new endorsement be denied.  AR 1977, 1882-83.

Based on these recommendations and the entire record, the Assistant Secretary (acting pursuant to a delegation of authority from the Secretary) determined that Dr. Klingenschmitt was "professionally unsuited for further service as a naval officer and chaplain."  AR 1971.  Among other things, he considered Dr. Klingenschmitt's performance and disciplinary record (including his fitness reports and court-martial conviction) as well as the lack of support for him in his chain of command.  <u>Id.</u>  Citing the 2006 fitness report, which had graded him "below average in the area of 'military bearing/character," he noted that Dr. Klingenschmitt's "recent professional performance has been unsatisfactory."  <u>Id.</u>  The Assistant Secretary also relied on Dr. Klingenschmitt's court-martial conviction for violating the lawful order of a superior commissioned officer in connection with the March 2006 media event at Lafayette Park.  <u>Id.</u>  Finally, the Assistant Secretary also relied upon the fact that "the Chief of Chaplains, your community leader, recommended denial of recertification and processing you for administrative separation."  <u>Id.</u>  He concluded that Dr. Klingenschmitt "d[id] not possess the character, leadership, or professional traits needed to successfully serve as a naval officer."  <u>Id.</u>

Dr. Klingenschmitt has failed to establish that there was any violation of law, rule, or regulation in connection with the separation process itself.  Thus, the Court can find no basis for Dr. Klingenschmitt's contention that neither the CARE board nor the Assistant Secretary had before them an adequate record on which to judge Klingenschmitt's suitability to be recertified and retained.

Indeed, at the oral argument in this matter, counsel for Dr. Klingenschmitt abandoned his argument that the administrative record before the Court was incomplete, and acknowledged that he had no basis for challenging the government's representation that it included at AR 1977-

2127 the entire record considered by both the CARE board and the Assistant Secretary.  Oral Arg. Tr. 40.  Those pages include, among other things, Dr. Klingenschmitt's fitness reports, the report of the investigation of his Article 138 grievance, the rulings in connection with his court-martial, and his own submissions in support of his recertification.  AR 1982.  See also AR 2008 (notifying Dr. Klingenschmitt that the CARE board would consider his official service record, the results of his court-martial, and any statements he might provide for its consideration).

There is similarly no merit to Dr. Klingenschmitt's argument that the CARE board acted beyond its authority by recommending his separation.  Pl.'s Mot. 44-45.  Specifically, he asserts that in deciding pursuant to OPNAVINST 1120.9, ¶ 5(b)(3) whether to recertify his professional qualifications, the CARE board was to look at whether the new ecclesiastical endorsement was "in correct and proper form."  Id.  He further asserts that in making a recommendation about Dr. Klingenschmitt's continuance as a chaplain "based on the needs of the Navy," the CARE board was supposed to address only "mathematical computations based on personnel vacancies."  Pl.'s Mot. 44.  This argument—that once a new ecclesiastical endorsement is received, the recertification process is merely pro forma—has already been properly rejected by the D.C. district court.  Memorandum Opinion at 5, Klingenschmitt v. Winter, No. 06-01832 (D.D.C. Aug. 21, 2007).  Moreover, the narrow reading that Dr. Klingenschmitt would ascribe to the phrase "the needs of the Navy" has no basis; the phrase is a broad one, and Dr. Klingenschmitt offers no rationale for the Court to adopt his narrow interpretation of its scope.  Further, his argument that the CARE board's sole function was to look at whether the new endorsement was "in correct and proper form" is inconsistent with OPNAVINST 1120.9, ¶ 6(b)(2), which provides that in determining an applicant's professional qualifications for a chaplaincy, the CARE board must consider their "professional experience, professional reputation, . . . and letters of personal or professional recommendation."

Finally, Dr. Klingenschmitt's claim that the decision not to recertify him constituted reprisal for constitutionally protected activity is not supported by the administrative record before the Court.  As the court of appeals for the D.C. Circuit observed, "[b]ecause mandatory, the Secretary's initiation of separation proceedings could not have been motivated by retaliatory animus."  Klingenschmitt v. Winter, 275 F. App'x. at 13.  Moreover, the administrative record reveals that the ultimate decision not to recertify Dr. Klingenschmitt was based on performance deficiencies and misconduct that were, as described above, unrelated to the content of his sermons or any other even arguably protected activity.

In that regard, the Court finds unpersuasive Dr. Klingenschmitt's argument that his First Amendment right to practice his religious beliefs was infringed by Captain Pyle's Order that he not wear his uniform to the media event held in Lafayette Park in March 2006.  Captain Pyle's Order was based on Navy regulations that prohibit the wearing of a uniform in connection with political activities.  AR 1458 (citing NAVPERS 15665I, ¶ 1401.3(b)); see also NAVPERS 15665I, ¶ 1401.3(c) (prohibiting the wearing of the uniform "[w]hen participating in activities such as public speeches, interviews, picket lines, marches, rallies or any public demonstration which implies the service supports the principles of the demonstration or activity").  The Order did not limit Dr. Klingenschmitt's right to engage in any religious practices (including presenting an opening prayer at the event or invoking the name of Jesus in his prayer).  It simply prohibited Dr. Klingenschmitt from engaging in this activity while wearing his uniform at what was clearly

a political event and not, as Dr. Klingenschmitt seems to suggest, a bona fide religious service.[23] Therefore, taking this infraction into consideration in deciding whether to recertify Dr. Klingenschmitt as a chaplain did not violate either his First Amendment rights or RFRA.

In short, the record fails to support a showing of any causal connection between any protected activity and Dr. Klingenschmitt's separation. For that reason, and because his other challenges to the lawfulness of the recertification process are without merit, the Court concludes that the Navy's decision not to recertify Dr. Klingenschmitt, which resulted in his administrative separation from the Navy, was neither arbitrary, capricious, nor contrary to law.

## CONCLUSION

For the reasons stated above, the government's motion to dismiss under RCFC 12(b)(1) is **DENIED-IN-PART** and **GRANTED-IN-PART**. The government's motion to dismiss under RCFC 12(b)(6) is **DENIED**. The government's motion for judgment upon the administrative record is **GRANTED**, and the plaintiff's motion is **DENIED**. The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

[23] Under the Navy's Uniform Regulations, service members may wear their uniforms when attending or participating in a bona fide religious service or observance. NAVPERS 15665I ¶ 1401.3(b)(4)(b) (quoted in full at footnote 9).